NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0240n.06
Filed: March 31, 2009

No. 07-3417

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ROBIN ALLEN MORRIS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| FAMILY DOLLAR STORES OF OHIO, | ) | NORTHERN DISTRICT OF OHIO |
| INC., | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

Before: GIBBONS and SUTTON, Circuit Judges; and ACKERMAN, District Judge.[*]

**JULIA SMITH GIBBONS, Circuit Judge**. Plaintiff-appellant Robin Allen Morris appeals the district court's grant of summary judgment in favor of defendant-appellee Family Dollar Stores of Ohio, Inc. ("Family Dollar"). After Morris was terminated from Family Dollar, he filed a complaint against Family Dollar alleging: (1) violation of the Family Medical Leave Act ("FMLA"); (2) violations of Title VII of the Civil Rights Act of 1964 ("Title VII") and Chapter 4112 of the Ohio Revised Code; and (3) violation of Ohio public policy. Morris argues that the district court erred by granting summary judgment on all three claims to Family Dollar. For the reasons that follow, we affirm the judgment of the district court.

---

[*] The Honorable Harold A. Ackerman, Senior United States District Judge for the District of New Jersey, sitting by designation.

1

## I.

Morris, a white male, was hired by Family Dollar in December of 2001.[1] After six months as a Stock Associate, he was promoted to Assistant Store Manager. In December of 2002, he was promoted to Store Manager by District Manager Juan Melendez. Morris served as Store Manager in several Family Dollar stores in the Cleveland, Ohio area before becoming the Store Manager at the West 73rd and Detroit Road store ("the Detroit Road Store" or "the store") in August or September of 2003.[2]

Ron Sheppard, a white male, was the Regional Manager during Morris's tenure as Store Manager. Rob Kozak was the District Manager for Family Dollar when Morris began working as manager of the Detroit Road Store.[3] Kozak is white. Melendez, an Hispanic male, took over as District Manager sometime during the summer of 2004. Paul Shnepp was the Assistant District Manager at this time. There was no evidence presented as to Schnepp's race or national origin. The two Assistant Store Managers at the Detroit Road Store, Mariely Capestany and Carlos Lozado, are both Hispanic.

---

[1] Morris's brief refers to an affidavit that he contends he filed with the district court. There is no record that he filed this affidavit with the district court, and although he said he would file a separate motion regarding this matter, he never did. Therefore, this opinion only refers to facts included in the record on summary judgment motion.

[2] Morris's deposition testimony states that he began working as manager at the Detroit Road Store in August 2004. It appears that he meant August 2003.

[3] Morris's deposition testimony says that Kozak was the District Manager in August 2004, but again, it appears that he meant August 2003, when Morris began at the Detroit Road store.

Sometime around mid-October 2004, Morris asked Melendez for one week of vacation beginning on October 29. Morris testified that Melendez approved the vacation, but "had some other negative things to say," including "cussing" at Morris like a "freaking maniac." (Morris Depo. at 91-97.) Morris also indicated that he contacted Human Resources regarding this incident and that Melendez later apologized. Melendez testified that he did not speak directly with Morris but that he heard about Morris's request from Schnepp. Whether through Morris directly or through Schnepp, Melendez was informed that Morris had requested one week of vacation to visit his mother, Betty Morris, who lived out of state and was undergoing surgery. Melendez approved Morris's request and never inquired as to the details of Morris's mother's condition or whether Morris's leave would fall under the FMLA.

Morris was at his mother's home in Parkersburg, West Virginia from October 29 through November 7, 2004. On October 29, Betty Morris underwent an outpatient needle biopsy of a lump in her left breast. Following the biopsy, she was bedridden for at least four days. During this time, Morris helped her with cooking, housekeeping, and bathing. During his deposition, Morris was asked if his mother was ever incapacitated, to which he answered "no." Betty Morris claims that during this time she suffered from headaches, stomach problems, dizziness from anesthesia administered during her biopsy, and pain and discomfort in her breast. Betty Morris learned that the lump was benign on or about November 1 when she received the results of the pathology report. She also saw Dr. Adam Kaplan for a post-surgical follow-up examination on November 8, 2004 and returned at least twice more as a result of the continued soreness in her breast.

3

Morris contends that while he was at his mother's home, he called the store to inquire about operations but did not speak to Melendez. Morris drove back to Cleveland on November 7, 2004.

Morris claims that he returned to the store at his usual time, 4:00 a.m, on November 8, 2004. When he arrived, Morris saw a locksmith changing the locks to the store.[4] He also saw his eventual replacement, Jose Rivera, working to open the store. Rivera is Hispanic. Morris testified that Rivera told him that he should contact Melendez regarding his employment.

At that point, Morris says that he returned home and at approximately 6:30 a.m. he called Melendez, leaving a voice message asking Melendez to call him regarding his employment. After his call was not returned, Morris says that he called Melendez at least twice more between 6:30 and 7:30 a.m., again leaving messages. Following this last call to Melendez, Morris did not attempt to contact anyone else at Family Dollar about his employment. Melendez never returned Morris's calls and denies receiving any phone calls from Morris.

Morris did not return to the store after November 8, 2004 and did not work any scheduled shifts after his week caring for his mother. Morris was officially terminated in mid-November 2004; on November 28, 2004, Morris was officially replaced by Rivera who had formerly been a Store Manager at another Family Dollar store.

---

[4] According to Melendez, the locks were changed for reasons unrelated to Morris's employment. Indeed, Morris stated that on the morning of November 8, loss prevention specialists were present at the scene, and Rivera told him that there were some issues regarding staff stealing from the store.

Morris filed a complaint against Family Dollar in Ohio state court alleging: (1) violation of the FMLA because he was terminated while caring for his mother; (2) race or national origin discrimination in violation of Title VII and Chapter 4112 of the Ohio Revised Code based on the fact that (a) he was terminated and replaced by a less qualified Hispanic candidate, and (b) Family Dollar discriminates against non-Hispanic employees "by failing to hire them and/or relegating them to certain positions at certain stores and failing to promote them to higher paying and/or supervisory positions"; and (3) violation of Ohio common law for wrongful discharge. Family Dollar removed this action to federal court.

With respect to the Title VII claim, Morris contends that Melendez, his District Manager, wanted to replace him with Rivera—an Hispanic Store Manager from another store, and alleged friend of Melendez—so that the store would have more Hispanic workers.

Family Dollar claims that Morris was not terminated because of his vacation, but terminated because he abandoned his employment. As evidence for this conclusion, it alleges that (1) Morris missed all of his remaining shifts without contacting Family Dollar; (2) Morris left his keys at the store; and (3) Melendez was informed by Capestany that Morris had called her on November 7, 2004 and resigned. In response, Morris contends there were only two sets of store keys and that he left his set at the Store during his absence for use by the Assistant Store Managers. He also denies that the alleged phone conversation with Capestany ever took place and argues that because Capestany

did not appear at her deposition, her statement constitutes inadmissible hearsay that should not have been considered by the district court.[5]

The district court granted Family Dollar's motion for summary judgment as to each of Morris's claims.

**II.**

We review a district court's grant of summary judgment *de novo*. *See Davenport v. Causey*, 521 F.3d 544, 550 (6th Cir. 2008). Summary judgment will be affirmed if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not appropriate if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We draw all justifiable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

---

[5] Capestany's statement was contained in her affidavit submitted to the district court as an exhibit attached to Family Dollar's motion for summary judgment. Capestany's affidavit also states that Morris did not report to the store on November 8, 2004 and that Morris called her that day to ask that she have Melendez call him. Morris attempted to depose Capestany, but she did not appear for her scheduled deposition. Morris filed a motion *in limine*, asking that the district court not consider Capestany's statement.

Because the district court did not rule on this motion yet referenced Capestany's statements in its opinion, Morris contends that the district court erred in "basing its decision" on these alleged hearsay statements. We address this issue in our discussion of Morris's FMLA claims.

**III.**

Morris first argues that the district court erred in granting summary judgment to Family Dollar with respect to his FMLA claim. The FMLA entitles an eligible employee[6] to twelve weeks of leave during any twelve-month period in order to care for a parent of the employee if that parent has a "serious health condition." 29 U.S.C. § 2612(a)(1)(C). There are two theories of recovery under the FMLA, which this court has summarized as follows:

> The "entitlement" or "interference" theory arises from [29 U.S.C.] § 2615(a)(1), which states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter," and from [29 U.S.C.] § 2614(a)(1), which provides that "any eligible employee who takes leave . . . shall be entitled, on return from such leave (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position." The "retaliation" or "discrimination" theory arises from [29 U.S.C.] § 2615(a)(2), which provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."

*Arban v. West Pub. Corp.*, 345 F.3d 390, 400-01 (6th Cir. 2003). Morris asserts both theories on appeal.

---

[6] Pursuant to 29 U.S.C. § 2611(2)(A), an "'eligible employee' means an employee who has been employed--(i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period." Here there is no dispute that Morris qualifies as an "eligible employee."

7

## A. FMLA Interference Theory

### 1. Preservation of Claim under the FMLA Interference Theory

First, Family Dollar argues that Morris did not preserve a claim based on the interference theory because he failed to clarify which theory he was advancing before the district court. Morris's complaint and response to Family Dollar's motion for summary judgment did not distinguish between the two theories.[7] The district court analyzed Morris's FMLA claim under the retaliation theory only.

In general, "[i]ssues that are not squarely presented to the trial court are considered waived and may not be raised on appeal." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1172 (6th Cir. 1996). In the context of FMLA claims, however, this court recently concluded that a plaintiff had not waived a claim based on the interference theory where the complaint alleged general violations of 29 U.S.C. § 2615 that could apply both to interference and retaliation claims. *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 446 (6th Cir. 2007). In reversing the district court's rejection of the plaintiff's interference claim as "an overly rigid approach which stands in conflict with our

---

[7] Morris's response to Family Dollar's motion for summary judgment included four sections addressing his FMLA claim. Section One is entitled "Plaintiff was qualified for FMLA leave" and argues that Morris is an eligible employee, an element required for both types of claims. This section cites an interference theory case, *Pharakhone v. Nissan North America, Inc.*, 324 F.3d 405 (6th Cir. 2003). Section Two is entitled "The Plaintiff Gave Proper Notice," again a required element for both types of claims. Section Three is entitled "Plaintiff's Mother Suffered From a 'Serious Health Condition,'" another requirement of both claims. Section Four is entitled "There is a Causal Connection Between Plaintiff's Leave and His Termination." This is the fourth element of a *retaliation* claim. At the end of this fourth section, Morris discusses the framework for a *retaliation* case, citing two retaliation cases, *Skrjanc v. Great Lakes Power Service Co.*, 272 F.3d 309 (6th Cir. 2001), and *Canitia v. Yellow Freight Systems, Inc.*, 903 F.2d 1064, 1066 (6th Cir.1990). The district court assumed that Morris raised only a retaliation claim. *Morris v. Family Dollar Stores of Ohio, Inc.*, No. 1:05 CV 2211, 2007 WL 893051, at *6 (N.D. Ohio Mar. 21, 2007).

notice-pleading system," *id.*, we explained in *Wysong* that "[a] defendant looking at [the plaintiff's] complaint would be on sufficient notice that she was broadly alleging violations under 29 U.S.C. § 2615, and that her FMLA claim could encompass either the interference theory, the retaliation theory, or both theories." *Id.* This court emphasized that ambiguity on a plaintiff's complaint does not waive an interference claim and "does not box plaintiffs into one theory or the other." *Id.*

Although *Wysong* involved the issue of whether a plaintiff had waived an argument before the district court instead of the appellate court, we find that our reasoning in *Wysong* applies equally to the situation at hand.[8] Although Morris should have clarified the theory on which he premised his claim, Family Dollar was clearly on notice that he might be advancing an interference claim—an issue it briefed below and on appeal. Given the overlapping nature of the two claims and the ambiguous nature of Morris's complaint, we will address both claims.

### 2. Merits of FMLA Interference Theory Claim

To establish a claim under the interference theory, a plaintiff must show that: (1) he was an eligible employee; (2) his employer was a covered employer; (3) he was entitled to leave under the

---

[8] Family Dollar argues that this case is controlled by the unpublished opinion in *Conner v. Hardee's Food Systems, Inc.*, 65 F. App'x 19 (6th Cir. 2003). In *Conner*, the plaintiffs' complaint alleged the breach of an implied contract without specifying whether the plaintiffs were advancing an implied-in-fact or implied-in-law theory of recovery. *Id.* at 24. After the defendant briefed both theories in its motion for summary judgment, the plaintiffs' response failed to clarify which theory they were advancing or explicitly state that they were proceeding upon a contract implied-in-law theory (although some language in their brief and one case cited suggested this theory). *Id.* The *Conner* court concluded that the claim was waived because the plaintiffs had "failed to brief the issue before the district court, and because the district court did not rule on the issue in its opinion." *Id.* at 24-25. Unlike the fairly different contract implied-in-law and contract implied-in-fact theories at issue in *Conner*, the FMLA interference and retaliation theories at issue here are closely related and largely overlap. Because of the similar nature of the two theories and *Wysong*'s on-point reasoning, we find *Conner* inapplicable.

FMLA; (4) he gave his employer notice of his intent to take leave; and (5) his employer denied him FMLA benefits or interfered with FMLA rights to which he was entitled. *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003). The intent behind the employer's conduct is not relevant to an interference claim. *Arban*, 345 F.3d at 401.

Family Dollar does not dispute that Morris is an eligible employee and that Family Dollar is a covered employer. Family Dollar contends, however, that Morris was not entitled to leave under the FMLA; that if he was entitled, he did not provide sufficient notice; and that even if he did provide notice, Family Dollar did not interfere with his FMLA rights.

The FMLA "entitle[s] employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition." 29 U.S.C. § 2601(b)(2). The statutory language of the FMLA limits "serious health condition" to "an illness, injury, impairment, or physical or mental condition that involves . . . inpatient care . . . or . . . continuing treatment by a health care provider." 29 U.S.C. § 2611(11). The regulations, in effect at the time the underlying conduct occurred, further defined "continuing treatment" as a "period of incapacity . . . of more than three consecutive calendar days . . . that also involves . . . [t]reatment two or more times by a health care provider . . . or . . . [t]reatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider." 29 C.F.R. § 825.114(a)(1)-(2) (2003).[9]

---

[9] The Department of Labor has recently promulgated new regulations interpreting the phrase "serious health condition." *See* The Family and Medical Leave Act of 1993, 73 Fed. Reg. 67934, 68079 (Nov. 17, 2008). Those regulations took effect on January 16, 2009, *id.* at 67934, and neither party argues that they should be applied retroactively here.

The legislative history clarifies that the FMLA "is *not* intended to cover short-term conditions for which treatment and recovery are very brief." S. Rep. No. 103-3, at 28 (1993), *as reprinted in* 1993 U.S.C.C.A.N. 3, 30 (emphasis added). "Conditions or medical procedures that would not normally be covered by the legislation include minor illnesses which last only a few days and surgical procedures which typically do not involve hospitalization and require only a brief recovery period." *Id.*; *see Beaver v. RGIS Inventory Specialists, Inc.*, 144 F. App'x 452, 456 (6th Cir. 2005) (collecting cases where plaintiffs' claims were denied because their "routine, short-term illnesses [were] not covered by the FMLA").

Morris contends that Betty Morris had a "serious health condition involving continuing treatment" based upon 29 C.F.R. § 825.114 (2003). Morris has offered some evidence of Betty Morris's health condition including: his own testimony that she needed help getting in and out of the shower and with household chores, and that she had trouble walking for approximately four days; and Betty Morris's affidavit, providing that following the biopsy, she was "bedridden for at least four days and her son had to take care of her every day needs." (Betty Morris Aff. at 1.)

However, Morris conceded that his mother was not "incapacitated." (Morris Depo. at 107.) Morris also does not dispute that after the biopsy, Betty Morris received a pathology report that the lump was benign, and she did not see her doctor again until a follow-up visit ten days after the biopsy. An outpatient procedure with a follow-up appointment is not a "regimen of continuing treatment." 29 C.F.R. § 825.114(a)(2)(i)(B) (2003). Neither does it constitute "[t]reatment two or more times by a health care provider." 29 C.F.R. § 825.115(a)(2)(i)(A) (2003); *see Doughtie v. Ashland, Inc.*, No. 03-2073, 2005 WL 1239286, at *4 (W.D. Tenn. May 24, 2005) (follow-up visit

11

with doctor eleven days after plaintiff had returned to work did not count as a second treatment by a health care provider); *see also Jones v. Denver Pub. Schs.*, 427 F.3d 1315, 1321 (10th Cir. 2005) ("[T]o qualify for FMLA protection, the health condition must be sufficiently serious that it entails an absence of more than three consecutive calendar days during which the employee obtained treatment by a health care provider at least two times (or one time followed by a regimen of continuing treatment)."); *Perry v. Jaguar of Troy*, 353 F.3d 510, 515 (6th Cir. 2003) (periodic examinations every six months did not render the condition a "serious health condition"); *Marchisheck v. San Mateo County*, 199 F.3d 1068, 1075 (9th Cir. 1999) (pre-arranged drug counseling session did not qualify as continuing treatment).

As the district court commented, "the Court has serious doubts as to whether an outpatient needle biopsy with one follow-up visit two weeks later would constitute a 'serious medical condition' for purposes of the FMLA." *Morris v. Family Dollar Stores of Ohio, Inc.*, No. 1:05 CV 2211, 2007 WL 893051, at *7 n.4 (N.D. Ohio Mar. 21, 2007). We agree. The outpatient needle biopsy involved neither inpatient treatment nor continuing treatment by a healthcare provider and simply does not satisfy the plain meaning of a "serious health condition" in the relevant statutory and regulatory language.

Because Morris failed to establish that Betty Morris had a "serious health condition" under the FMLA, we find that he did not make out a *prima facie* case under the interference theory. Thus, we do not need to address the other prongs of his interference claim.

**B. FMLA Retaliation Theory**

FMLA retaliation theory claims are analyzed under the burden-shifting framework established by *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Edgar v. JAC Prods.*, 443 F.3d 501, 508 (6th Cir. 2006). To establish an initial *prima facie* case of retaliation, a plaintiff must show the following by a preponderance of the evidence: "(1) he engaged in an activity protected by the [FMLA]; (2) that this exercise of his protected rights was known to the defendant; (3) that defendant thereafter took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Arban*, 345 F.3d at 404. The significant difference between an interference and a retaliation claim is the causal connection element, which encompasses an employer's intent; in contrast to the interference theory, under the retaliation theory, "the employer's motive *is* an integral part of the analysis." *Edgar*, 443 F.3d at 508. If the plaintiff can prove a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employer's action. *McDonnell Douglas*, 411 U.S. at 802. If the defendant carries this burden, the plaintiff must show that the legitimate reasons offered by the defendant are pretextual. *Id.* at 804.

Because Morris's leave was not on account of a serious health condition, he cannot establish the first element, that he engaged in an activity protected by the FMLA. For the same reasons that Morris's FMLA interference claim fails, we affirm the grant of summary judgment to Family Dollar on Morris's FMLA retaliation claim.

## C. Capestany's Statements

Morris claims that the district court improperly relied on Capestany's statements in its decision. Her affidavit was submitted to the district court as an exhibit attached to Family Dollar's motion for summary judgment. Capestany's affidavit included the following facts: Morris called her on November 7, 2004 to tell her that he would not be returning to work; Morris did not come to the store on November 8; and Morris called her on November 8 to ask that she have Melendez call him. Because Capestany did not appear for her scheduled deposition, Morris filed a motion *in limine*, requesting that the district court not consider Capestany's affidavit. The district court did not rule on this motion but referenced Capestany's statements in its opinion. On appeal, Morris contends that the district court erred in "basing its decision" on these alleged hearsay statements.

Because we find that Morris did not establish a *prima facie* FMLA case, Capestany's statements about Morris's termination are irrelevant to our analysis. Therefore, resolution of the potential hearsay issues is not necessary.[10]

## IV.

Morris next argues that the district court erred by granting Family Dollar summary judgment with respect to Morris's claims of race/national origin discrimination under Title VII and Chapter 4112 of the Ohio Revised Code. Federal case law interpreting Title VII applies to cases involving alleged violations of Chapter 4112 of the Ohio Revised Code. *See Plumbers & Steamfitters Joint*

---

[10] Morris's statements to Capestany appear to be admissible admissions against interest. The viable evidentiary issue is whether the district court should have considered Capestany's affidavit in view of her failure to appear for her deposition – an issue which we need not reach.

14

*Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981). Thus, "federal and state claims may be analyzed together . . . because 'Ohio's requirements are the same as under federal law.'" *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (quoting *Carter v. Univ. of Toledo*, 349 F.3d 269, 272 (6th Cir. 2003)). The following analysis of Title VII law therefore applies to Morris's claims under both Title VII and Chapter 4112 of the Ohio Revised Code.

Because Morris offers circumstantial, as opposed to direct, evidence of discrimination, he must satisfy the Supreme Court's burden-shifting framework:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (internal citations omitted). To establish a *prima facie* case of Title VII discrimination in a typical case, a plaintiff must show that: "1) he is a member of a protected class; 2) was qualified for the job; 3) he suffered an adverse employment decision; and 4) was replaced by a person outside the protected class or treated differently than similarly non-protected employees." *Newman v. Fed. Express Corp*., 266 F.3d 401, 406 (6th Cir. 2001). However, in a reverse discrimination case—where a member of the racial majority claims racial discrimination—the first and fourth prongs of the test are different. To satisfy the first prong of the test, "the plaintiff must demonstrate background circumstances [to] support the

15

suspicion that the defendant is that unusual employer who discriminates against the majority." *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003) (alteration in original) (internal quotation marks and citation omitted). To satisfy the fourth prong in a reverse discrimination case, the plaintiff must show that the defendant treated minority employees who were similarly situated to the plaintiff more favorably than he was treated. *Id.*

## A. *Prima Facie* Case

### 1. *Background Circumstances*

As an initial matter, Morris suggests that we should abandon the background circumstances test altogether—an argument Family Dollar contends he did not preserve. We need not labor over the preservation issue. One panel cannot disregard the decisions of prior panels. *Bowling Transp., Inc. v. NLRB*, 352 F.3d 274, 282 (6th Cir. 2003).

Morris's alternative argument is that he *has* alleged sufficient background circumstances: Morris is white; Melendez is Hispanic; and Melendez replaced Morris with Rivera, an Hispanic employee.

A plaintiff may establish background circumstances by providing "evidence of the defendants' unlawful consideration of race in employment decisions in the past." *Sutherland*, 344 F.3d at 615. This court has held that a plaintiff can demonstrate background circumstances by showing simply that the employer was a member of the same minority race as the employees he was promoting. *See Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 257 (6th Cir. 2002) (relying on the single factor that the police chief was African-American and was promoting African-Americans).

16

The district court found that Morris had not shown background circumstances. Searching only for evidence that Family Dollar had unlawfully considered race as a factor in the past, the district court concluded: "Family Dollar management was composed of individuals of various races, who hired and fired individuals of various races. Employees of various races were frequently promoted and/or moved between stores." *Morris*, 2007 WL 893051, at *10. Family Dollar suggests that to establish background circumstances, Morris *must* show that Family Dollar unlawfully considered race in employment decisions in the past. But *Zambetti* was careful to say only that a plaintiff "*can present*" such evidence to show background circumstances. 314 F.3d at 256 (emphasis added) (citing *Jamison v. Storer Broad. Co.*, 830 F.2d 194 (6th Cir. 1987) (table)); *accord Sutherland*, 344 F.3d at 615. Following *Zambetti*'s reasoning that "the mere fact that an adverse employment decision was made by a member of a racial minority is sufficient to establish the first prong of the *prima facie* case," *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008), Morris has provided the requisite background circumstances by showing that Melendez is Hispanic and that he replaced Morris with an Hispanic employee.

### 2. Similarly Situated

In a Title VII reverse discrimination case, this court has explained that "[i]n order for . . . employees to be considered similarly-situated . . . the plaintiff must prove that all of the relevant aspects of his employment situation are nearly identical to those of the [minority] employees who he alleges were treated more favorably." *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994) (internal citations and quotation marks omitted). The "plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment," *Ercegovich v. Goodyear*

17

*Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998), but the plaintiff needs to be similar in "all of the *relevant* aspects." *Id*. (quoting *Pierce*, 40 F.3d at 802). Where an employee alleges discriminatory disciplinary action, this court has further explained that "the individuals with whom the plaintiff seeks to compare his/her treatment must . . . have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).

Morris has not provided evidence of an employee similarly situated "in all relevant aspects." *Pierce*, 40 F.3d at 802 (internal quotation marks omitted). To show this, he must show that another employee "engaged in the same conduct" without receiving the same consequences. *See Mitchell*, 964 F.2d at 583. Morris has offered no evidence that a non-white employee requested vacation to visit a relative and was treated differently upon return. Having failed to make a showing of a similarly situated employee, Morris cannot establish a *prima facie* case of discrimination. *Arendale*, 519 F.3d at 604.[11]

---

[11] As evidence of bias in favor of Hispanic employees, Morris presented evidence that Rivera was paid slightly higher than he was, despite his lesser seniority. To the extent that this could constitute support for a Title VII *wage discrimination* claim, as opposed to a Title VII termination claim, Morris has since waived the claim because he failed to argue wage discrimination either before the district court or on appeal and presented this evidence only to support his termination claim. *See Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" (quoting *United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999))); *see also Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 311 (6th Cir. 2005) ("[Plaintiff's] failure to raise an argument in his appellate brief constitutes a waiver of the argument on appeal.").

## V.

Lastly, Morris argues that the district court erred by dismissing his tort claim that his discharge violated Ohio public policy. Any alleged violation of Ohio public policy derived from a violation of the FMLA, Title VII, or the Ohio Revised Code is dependent upon the violation of one of those statutes.[12] *See Skrjanc*, 272 F.3d at 317; *Hausler v. Gen. Elec. Co.*, 134 F. App'x 890, 895 (6th Cir. 2005) ("Public policy claims necessarily fail where the underlying statutory claims fail." (citing *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 375 (6th Cir. 1999))). Because Morris has failed to establish a *prima facie* case of discrimination under the FMLA, Title VII, or the Ohio Revised Code, his tort claim fails as a matter of law.

## VI.

For the foregoing reasons, we affirm the judgment of the district court.

---

[12] Morris acknowledges that the FMLA cannot serve as the "policy" basis for his public policy claim following *Wiles v. Medina Auto Parts*, 773 N.E.2d 526 (Ohio 2002). In *Wiles*, the Ohio Supreme Court concluded that because "the statutory remedies in the FMLA adequately protect the public policy embedded in the [FMLA]," a case alleging a violation of the FMLA could not establish the requisite elements of a claim of wrongful discharge in violation of public policy. *Id.* at 535.

19